UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| J.S. MCCARTHY CO., INC., d/b/a<br>J.S. MCCARTHY PRINTERS,<br><br>                Plaintiff,<br><br>   v.<br><br>BRAUSSE DIECUTTING &<br>CONVERTING EQUIPMENT, INC.,<br><br>                Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil No. 04-107-B-W<br>)<br>)<br>)<br>)<br>)<br>) |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

      J.S. McCarthy contracted to buy and Brausse Diecutting & Converting Equipment, Inc., contracted to sell and install at J.S. McCarthy's premises a machine designated as a Brausse Automatic Foil Stamping Machine, model SBL 1050 SEF. The contract price was $375,000, of which J.S. McCarthy has paid all but $93,750. J.S. McCarthy initiated this lawsuit, seeking contract and tort remedies based on allegations that the machine Brausse delivered was not a "genuine" SBL 1050 SEF machine, but an inferior "knockoff" that failed to conform to the parties' agreement. In conjunction with its answer, Brausse filed a counterclaim for the balance of the contract price. In a prior ruling, this court denied a motion for summary judgment filed by Brausse in which Brausse contended that J.S. McCarthy lacked any evidence of consequential damages and was barred from recovering such damages pursuant to the terms of the contract. Currently before the court is a second summary judgment motion filed by Brausse that is meant to be dispositive of all claims presented in the case. I recommend that the court

deny Brausse's second motion for summary judgment with respect to the parties' competing contract claims, but grant summary judgment in Brausse's favor on the balance of the case.

**Facts**

The following recitation of facts is drawn from the parties' Local Rule 56 statements of material fact in accordance with this District's summary judgment practice. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the practice). All genuine evidentiary disputes generated by the parties' statements have been resolved, for purposes of summary judgment only, in favor of the non-movant. Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

On April 30, 2003, J.S. McCarthy and Brausse entered into a sales agreement in which J.S. McCarthy agreed to buy and Brausse agreed to sell a commodity identified as a:

> BRAUSSE Automatic Foil Stamping Machine with LCD Screen Display Control System, High Riser and Diecutting and Stripping Capabilities (Air Compressor not included), Model: SBL 1050 SEF.

(Statement of Material Facts ("Statement"), Docket No. 41, ¶ 1.) The Sales Agreement was entered into after months of negotiations between the parties. (Id. ¶ 2.)

Brausse is a Minnesota corporation that is a North American distributor for P.E. Printech Equipment, Inc. ("Printech"), a Canadian corporation. (Id. ¶ 5.) Brausse is a sales and service organization and, through Printech, Brausse imports and sells printing and other post-printing equipment under the Brausse label. (Id. ¶ 6.) According to the affidavit testimony of John Cheng, Printech's president, the SBL 1050 SEF is a product produced pursuant to Printech's designs and specifications at different manufacturing

plants in Canada, Taiwan and mainland China. (Id. ¶¶ 7, 22.) However, Brausse elsewhere admits that nobody owns the design for the machine. (Opposing Statement of Additional Material Facts ("Additional Statement"), Docket No. 52, ¶ 134.) A more accurate description appears to be that the SBL 1050 SEF label or model number denotes a specific machine commodity supplied to Printech by Smoothbonwell Industrial Co., Ltd., through an intermediary purchasing agent in Hong Kong called Top Health, Inc., and that Smoothbonwell typically relays an order for the machine to different production plants, some of which have an affiliation with Brausse. (Statement ¶¶ 16, 58; Opposing Statement of Material Facts ("Opposing Statement"), Docket No. 52, ¶¶ 7, 16, 58.) Printech was able to request certain specifications with its order, but these appear to have been limited to having the Brausse[1] brand name painted or printed on the commodity, having the English language loaded or programmed into the machine's readouts, and ensuring that the machine's electrical system would meet the appropriate North American or Canadian electrical standards. (Id.; see also Opposing Statement's Ex. D at SBL 00021 (purchase contract between Top Health and Smoothbonwell).)

David Yang was the sales representative for Brausse in relation to the transaction with J.S. McCarthy. (Statement ¶ 26.) In March 2003, David Yang offered J.S. McCarthy a choice between two machines: a machine manufactured in Taiwan or one of the first machines built at a new Shanghai plant. (Id. ¶ 28.) Yang told J.S. McCarthy that the machine made in Taiwan could be delivered sooner but would cost an additional $100,000. He indicated that there would be no difference between the machines other than price. (Id. ¶ 29; Opposing Statement ¶ 29.) As of that time, however, no machine of

---

[1] Printech owns the Brausse trade name. (Statement ¶ 8.) J.S. McCarthy's statement of additional material facts reflects that there is a symbiotic relationship between Printech and Brausse. (Additional Statement ¶¶ 19-21, 27-28, 38-42.)

3

the kind in question had ever been produced at the Shanghai plant. (Statement ¶ 33.) The machine that served as the demo during sales negotiations was a machine made in Taiwan by an entity—or an affiliate of an entity—known as SBL.[2] (Id. ¶ 29-34; Opposing Statement ¶¶ 29-34.)

On April 30, 2003, Brausse offered to sell J.S. McCarthy a machine manufactured in Shanghai, at a price of $375,500. J.S. McCarthy accepted and a sales agreement was prepared. (Statement ¶ 37.) The agreement designated September 15, 2003, as the latest date the machine would be shipped from Shanghai and October 15, 2003, as the latest date the machine would be "up and running" at J.S. McCarthy's location. (Id. ¶ 38.) The sales agreement set forth numerous machine specification, such as maximum and minimum paper size, maximum cutting size, maximum cutting pressure, and maximum mechanical speed, but it did not set forth any performance specifications. (Id. ¶ 60.) However, during negotiations, Brausse provided J.S. McCarthy with marketing materials for the machine built in Taiwan. (Additional Statement ¶ 84.) Those materials were authored by Brausse and set forth certain performance standards not reiterated in the sales agreement. (Id. ¶¶ 85-86.) The record would support the inference that those performance standards are based on the performance of the Taiwan-built (or SBL-built) machine. (Id. ¶ 87.)

Despite the October 15, 2003 due date, the machine was not delivered to J.S. McCarthy until November 17, 2003. (Statement ¶ 79.) J.S. McCarthy never communicated to Brausse that it would treat Brausse's failure to meet the delivery date as a material breach of the sales agreement. (Id. ¶¶ 76-77, 80.) After the machine's arrival, it became apparent that it did not meet Brausse's performance specifications. Although

---

[2]  A picture of the machine can be found at: http://www.cgmachinery.com/SBL1050SEF.htm.

J.S. McCarthy does not contest that the technical machine specifications were, in the main,[3] satisfied (id. ¶¶ 61-62) or that it was able to produce salable product with the machine (id. ¶¶ 64-65), J.S. McCarthy asserts that the machine failed to operate properly or consistently from the beginning and has the testimony needed to support such a finding. (Opposing Statement ¶ 66; Additional Statement ¶¶ 96, 99.) In fact, it is undisputed that there were numerous service calls after the machine was delivered, some number of which required replacement of various defective parts.[4] (Statement ¶¶ 67-69.) According to J.S. McCarthy, Brausse's contract technicians were not able to get the machine to operate the way it was supposed to despite expending numerous days of labor on it over the course of several months.[5] (Opposing Statement ¶¶ 67, 70.) J.S. McCarthy removed the Brausse machine from its facility in August 2004 and replaced the machine with a SBL 1050 SEF machine manufactured by an SBL-affiliated plant. (Statement ¶ 88; Opposing Statement ¶ 88.) The performance of the replacement SBL 1050 SEF machine, which J.S. McCarthy purchased from another dealer, confirmed for J.S. McCarthy that Brausse's Shanghai machine was of inferior quality and that its poor performance was not a consequence of operator error but of inferior manufacture and/or design. (Additional Statement ¶ 105.) As a consequence of the Brausse machine's poor performance, J.S. McCarthy suffered consequential damages. (Id. ¶¶ 100-104, 106.) J.S.

---

[3] According to William White, J.S. McCarthy's chief operating officer, the machine could not handle paper forty inches wide and was never repaired so that it was able to do so, contrary to a machine specification that indicated it would be able to handle paper of that size. (Additional Statement ¶ 95.) Note that there is conflicting testimony from another J.S. McCarthy witness, who testified that this problem was eventually fixed. (Reply Statement of Material Facts, Docket No. 56, ¶ 95.)

[4] These problems were serious enough for Brausse to extend the one-year warranty to 18 months. (Statement ¶ 71.)

[5] The sales agreement suggested that Brausse would be able to have the machine installed and running and have J.S. McCarthy's personnel trained within eight days. (Statement ¶ 87; Opposing Statement ¶ 87.)

McCarthy has paid Brausse all but $93,750 of the $375,000 price set forth in the sales agreement.  (Statement ¶¶ 89-95.)

The production plant in Shanghai is owned by IMG-Dong Fang, a business unit of IMG Aktiengesellschaft, Inc., headquartered in Germany.  (Statement ¶¶ 11-12; Additional Statement ¶ 71.)  The Shanghai plant is described in J.S. McCarthy's papers as the "Eterna" plant.  (Additional Statement ¶ 71.)  The machine J.S. McCarthy purchased was the very first machine of its kind manufactured at the Eterna plant.  (Id. ¶ 83.)  The corporate parents or owners of both the Eterna plant and Brausse are affiliated and there is also a familial relationship between Mr. Cheng and the manager of the Eterna plant.  (Statement ¶¶ 11-12, 23.)  Mr. Chang's brother, Gary Tseng, previously worked on the design and production of these machines at a Taiwan plant (quite possibly an SBL plant) and now manages the Eterna plant in Shanghai.  (Id. ¶¶ 23-25.)  At the time the contract was entered into, J.S. McCarthy understood that the machine it was buying was to be produced in Shanghai, that it would be built according to the same design as the demo machine that had been manufactured in Taiwan, and that lower labor costs in Shanghai would save J.S. McCarthy $100,000 from the retail purchase price.  (Id. ¶¶ 13-15, 55-56; Opposing Statement ¶¶ 13-15, 55-56.)  According to Brausse, the Shanghai machine was built according to the same design and machine specifications as the Taiwan machines manufactured by SBL and includes certain "refinements and improvements" on the basic machine.  (Statement ¶¶ 19-20, 50.)  Brausse asserts, and J.S. McCarthy admits, that Brausse's goal was to achieve the same quality and design as the Taiwan machine.  (Id. ¶ 24.)

In addition to the foregoing facts and circumstances, J.S. McCarthy attempts to generate a genuine issue of material fact capable of supporting its fraud, negligent misrepresentation and deceptive trade practices claims. The record reflects that at the time the sales agreement was entered into, J.S. McCarthy did not know that "SBL" is a designation for a specific commercial group or entity that has among its assets a manufacturing plant in Taiwan that produces SBL 1050 SEF machines. According to J.S. McCarthy, Brausse intentionally attempted to defraud or mislead J.S. McCarthy by trying to pass off an Eterna-manufactured "knock off" machine as a "genuine" SBL manufactured machine. (Opposing and Additional Statements, *passim*.) In support of this theory, J.S. McCarthy has placed in the record certain documents that tend to establish that, shortly before the subject contract came into being, this SBL entity terminated a business relationship with Printech because Printech was placing the SBL name on machines not manufactured by SBL.[6] (Additional Statement ¶¶ 5, 127, 132-133.) There is also testimonial evidence tending to show that the severance of the relationship was related to attempts by Brausse to register SBL as its own trademark in the United States.[7] (Id. ¶ 107.)

Brausse has "objected" to the introduction of the documents that would support these findings based on an alleged discovery violation, but Brausse has not presented the objections in a formal motion to strike. Instead, Brausse's objection is set forth in a

---

[6] Although Brausse attempts to disavow any historic link to a "company" having the SBL name (see Statement ¶ 43), a Brausse sales brochure in the record reflects that at one time "Brausse Group" identified itself as being part of the same "family" as the "SBL Group." (Additional Statement ¶ 3, citing Exhibit L.) It is one thing to try to exclude probative evidence from the record. It is quite another to affirmatively dissemble historic facts.

[7] There is also evidence that Brausse no longer markets the commodity in question as a Brausse model SBL 1050 SEF. (Additional Statement ¶ 131.) Instead, it identifies the commodity as a Brausse model 1050SEF, having dropped the SBL prefix. (Id. ¶¶ 46-47; Reply Statement ¶¶ 46-47.)

general objection preamble to Brausse's reply statement of material fact (Docket No. 56). The documents at issue tend to establish that "SBL" is the trademark of another commercial entity that does business under the SBL name. It also appears that this entity owns or operates one or more manufacturing plants in Taiwan that produce SBL 1050 SEF machines, that this entity marks the machines with a nameplate that reads, "SBL-1050SEF," and that the nameplate also includes a distinctive symbol that combines the letters T and S, which presumably stand for a related manufacturing company named Tsair-Shuenn. (Additional Statement ¶ 2, citing Exhibits J and M.) Based on what appears (by American legal standards) to be trademark infringement by Brausse, J.S. McCarthy argues that representations Brausse made to it during contract negotiation were fraudulent because Brausse referred to both the Taiwan and Shanghai plants as "our" plants (Additional Statement ¶¶ 88-89) and, in J.S. McCarthy's words, failed to disclose that the Shanghai machine was a "knockoff" of a "genuine" Taiwan machine built by SBL.

In my view, the trademark issue is ancillary and immaterial to the parties' real dispute. The undisputed record reflects that J.S. McCarthy contracted to purchase a "Brausse Automatic Foil Stamping Machine . . . Model: SBL-1050SEF" *commodity*, had no knowledge of the significance of the SBL moniker at the time of contracting and had no intention of buying a machine specifically made at a plant owned or run by the "SBL" entity referred to above. Instead, the record reflects that J.S. McCarthy, having been offered the opportunity to purchase a machine built in Taiwan, chose to purchase a substantially cheaper machine built in Shanghai on the understanding or condition that the machine would be, in all material respects, the equal of the demo machine

8

manufactured in Taiwan (hence the use of the term "commodity" in the agreement). The record further establishes that, regardless of who formally owns or runs the Shanghai plant at which the subject machine was made, the parties *mutually agreed* that the machine would be the equal of the Taiwan demo in all material respects. Based on these factual circumstances, I conclude that J.S. McCarthy's many statements about the Shanghai machine being a "knockoff" are immaterial. The issue presented in this case is simply whether or not J.S. McCarthy received the benefit of its bargain. Indeed, nowhere in the summary judgment record presented by J.S. McCarthy is there any suggestion that it would have instituted this suit if the machine in question had performed as the parties agreed and expected it would, which is perhaps as strong an indication of immateriality as there could be.

## Discussion

A movant is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merchants Ins. Co., 143 F.3d at 7. If such facts and inferences could

9

support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

### A.     Breach of Contract

Brausse contends that it is entitled to summary judgment on the contract dispute because "[t]here is no question regarding the material fact that the [m]achine Brausse delivered to [J.S.] McCarthy satisfied fully the description and the specifications contained in the Sales Agreement." (Mot. Summ. J., Docket No. 40, at 11.) In effect, with this aspect of Brausse's motion it is seeking a judgment that, as a matter of law, there was no breach. Both parties' statements of material fact reflect that their contract was built on the mutual understanding that Brausse would be able to deliver a machine built in Shanghai that would be the equal of the demo machine built in Taiwan in all material respects (it would conform in all material respects with the characteristics of the commodity in question). Because there is a genuine issue of material fact whether the machine Brausse delivered to J.S. McCarthy conformed to this most basic contract condition, Brausse is not entitled to summary judgment on the question of whether it breached the agreement to sell the commodity in question or to make the commodity conform under the warranty within a reasonable timeframe.

Brausse also asserts that it is entitled to summary judgment to the extent J.S. McCarthy contends that late delivery constituted a breach of the agreement. The material issue here appears to be whether J.S. McCarthy may include in its damages computation the period of time between October 15, 2003, and November 17, 2003. Brausse argues that J.S. McCarthy may not do so because it did not reject the machine based on late

10

delivery.  (Id. at 13.)  Brausse fails to cite any authority for the proposition that a failure to reject a tardily delivered, nonconforming good based on the fact of late delivery precludes late delivery from factoring into a consequential damages award.  Based on this failure to abide by Local Rule 7 and based on the fact that this *scope* of damages issue is ancillary to the question of substantive liability,[8] I have not see the need to address the issue on the record currently before me.

**B.    Breach of Warranty**

Count II of the amended complaint asserts a claim for breach of an express warranty.  (Am. Compl., Docket No. 30.)  Brausse contends that it is entitled to summary judgment against J.S. McCarthy's claim for breach of the express warranty because the only remedy available under the agreement for breach of warranty is repair and replacement during the warranty term and because J.S. McCarthy moved the machine prior to the expiration of the warranty term, thereby voiding the warranty.  (Mot. Summ. J. at 14.)  J.S. McCarthy responds that Brausse's failure to deliver the "proper machine" and its inability "to get the machine to perform as promised" breached Brausse's express warranty.  (Opp'n Mem., Docket No. 51, at 15.)  Neither party makes any effort to brief the matter in terms of the applicable legal standards and relevant precedents, although both appear to concede that the dispute is governed by the Uniform Commercial Code.

The sales agreement provided that the machine commodity would be "free from defects in materials and workmanship when . . . used properly and in accordance with the

---

[8] In my preceding recommended decision on Brausse's prior motion for summary judgment I concluded that the record contains admissible evidence that might support a finding that J.S. McCarthy suffered consequential losses.  Thus, contrary to Brausse's contention in the instant motion, this is not a case in which there is a "lack of evidence of any damages associated with the claim."  (Mot. Summ. J. at 13, quoting Net 2 Press, Inc. v. 58 Dix Ave. Corp., 266 F. Supp. 2d 146, 161 (D. Me. 2003) (magistrate judge's recommendation, aff'd over obj.).)

11

directions" and that the express warranty "is the only warranty by the Seller with respect to the commodity specified in this Agreement.  No other warranties of any kind . . . shall apply."  (Sales Agreement, Ex. 1 to Original Compl., Docket No. 1.)  It further provided that the "remedy for breach of warranty shall be limited to replacement of defective parts (mechanical and electrical), repairing and labor related" [sic].  (Id.)  There is no suggestion by J.S. McCarthy that the warranty limitation set forth in the sales agreement, by its terms, is in any way unenforceable or otherwise contrary to Maine law.  The kinds of relief sought by J.S. McCarthy in its amended complaint ("full refund," compensatory damages, revocation of acceptance, permanent injunctive relief, attorney's fees and costs) (see Am. Compl., Docket No. 30, at 17) are of a different character than the kind of remedies allowed under the sales agreement for a breach of warranty.  It is also well-established that contracting parties may limit in this fashion both warranties and the remedies that would otherwise be available for breach of warranty.  See, e.g., Lincoln Pulp & Paper Co. v. Dravo Corp., 445 F. Supp. 507, 516 (D. Me. 1977); 11 M.R.S.A. § 2-719.  However, pursuant to section 2-719(2) of the Uniform Commercial Code: "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Title."  11 M.R.S.A. § 2-719(2).

      Because I conclude that there is a genuine issue of material fact whether Brausse breached its express warranty, I recommend that the court not enter summary judgment on the warranty claim (count II).  The record generates a genuine issue of material fact whether Brausse was able to make good on its express warranty even after numerous service calls over the course of months.  Although J.S. McCarthy does not so much as mention section 2-719(2) of the UCC in its opposition memorandum, its factual

12

presentation nevertheless generates the issue whether Brausse was able to make the machine conform to the contract within a reasonable timeframe. See, e.g., Razor v. Hyundai Motor Am., 813 N.E.2d 247, 258 (Ill. Ct. App. 2004) ("A remedy limitation fails of its essential purpose when a seller unreasonably delays the replacement of the product, refuses to replace it at all, or is unsuccessful in correcting the defects within a reasonable time."); Sunny Indus. v. Rockwell Int'l Corp., 1999 U.S. App. LEXIS 7001, *27-30, 1999 WL 220109, *10 (7th Cir. Apr. 12, 1999) (unpublished opinion) ("It is unusual for a remedy to fail of its essential purpose, but this typically occurs when a contract's primary remedy is repair or replacement of defective parts, and this remedy fails to put the goods in their warranted condition.").

**C.     Fraud**

Brausse contends that the summary judgment record lacks clear and convincing evidence of fraud. (Mot. Summ. J. at 15.) I agree. The summary judgment record reflects that J.S. McCarthy agreed to buy and Brausse agreed to sell a Brausse automatic foil stamping machine commodity, model SBL 1050 SEF, that was to be manufactured in Shanghai, China, according to the same design and specifications as the Taiwan-built machine that served as a demo during contract negotiations and for $100,000 less than the Taiwan-built machine. That the machine should originate from a particular plant was never a material condition of the parties' sales agreement. The record also reflects that Brausse attempted to have a conforming machine manufactured at a plant in Shanghai. Based on these circumstances, there is an absence in the record of clear and convincing evidence that J.S. McCarthy relied to its detriment on a representation concerning the machine's provenance or that Brausse made a false representation of material fact with

13

the requisite reckless—or more culpable—state of mind. Nor is there clear and convincing evidence that J.S. McCarthy suffered any particularized injury by virtue of the machine not originating from a Brausse- or SBL-run plant. See Mariello v. Giguere, 667 A.2d 588, 590 (Me. 1995) (setting forth the elements of common law fraud). Instead, the record reflects that J.S. McCarthy's injury is characterized by a commercial loss arising from the failure of a commercial sales product to conform to contractual expectations, a circumstance that ordinarily does not allow for the interjection of tort causes of action and remedies. See, e.g., Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, 659 A.2d 267, 270 (Me. 1995) (indicating that it is the purpose of contract law, not tort law, to address claims arising from the failure to receive product value and quality in a commercial context); Gannett v. Pettegrow, 2005 U.S. Dist. LEXIS 1357, *24-28, 2005 WL 217036, *8 (D. Me. Jan. 28, 2005) (magistrate judge's recommendation, affirmed over objection) (discussing economic loss doctrine in context of misrepresentation torts and collecting cases). Accordingly, summary judgment should enter in Brausse's favor on count III.

**D.     Negligent Misrepresentation**

Brausse argues that the negligent misrepresentation claim is similarly deficient because there is no basis in the record for concluding that J.S. McCarthy suffered a reliance-based injury due to the fact that the machine was not manufactured by either Brausse or SBL. (Mot. Summ. J. at 25.) I agree with this assessment of the negligent misrepresentation claim for the reason stated. If the fact finder should conclude that J.S. McCarthy suffered an actionable injury, it would have to be based on a finding that the machine Brausse delivered did not conform to the parties' contractual expectations

14

concerning the machine's performance.  Brausse is entitled to summary judgment on count IV.

E.        **Deceptive Trade Practices Act, 10 M.R.S.A. §§ 1211-1216**

Pursuant to Section 1213 of Maine's Deceptive Trade Practices Act (MDTPA), injunctive remedies under the Act are available only to one "likely to be damaged by a deceptive trade practice of another."  10 M.R.S.A. § 1213.  Moreover, the Act "only provides for injunctive relief and does not support a legal claim."  L.L. Bean, Inc. v. Drake Publishers, Inc., 629 F. Supp. 644, 647 (D. Me. 1986); see also J.S. McCarthy, Co. v. Brausse Diecutting & Converting Equip., 340 F. Supp. 2d 54, 62 (D. Me. 2004) (same).  Brausse argues it is entitled to summary judgment on this claim because injunctive relief is "inapposite to this case."  (Mot. Summ. J. at 26.)  I agree.

In a prior order on Brausse's motion to dismiss, this court observed that the MDTPA "is more commonly used, not in a one time sale, . . . but in an ongoing infringement."  J.S. McCarthy, Co., 340 F. Supp. 2d at 62.  The court further observed that J.S. McCarthy "is not seeking to enjoin Brausse from further deception; it is seeking a remedy solely for past deception."  Id.  Based on the nature of the relief requested by J.S. McCarthy, the court granted Brausse's motion to dismiss the MDTPA claim.  Id.  Also in that prior order, the court afforded J.S. McCarthy 60 days in which to conduct discovery so that it might be able to allege its fraud count in a manner specific enough to comply with Rule 9(b).  Id. at 60.  J.S. McCarthy thereafter moved to amend its complaint in compliance with the court's order.  (Docket No. 21.)  In addition to amending its fraud count, J.S. McCarthy revised its MDTPA claim and its plea for relief

15

to include a request for injunctive relief.  The court permitted the amendment.  (Order on Pl.'s Mot. for Leave to Am. Compl., Docket No. 29.)

The amended complaint's recitation of the MDTPA claim continues to allege only past conduct.  (Am. Compl. ¶¶ 77-84.)  The injunctive relief requested is the following: "enter a permanent injunction ordering Brausse to refrain from . . . representing that its machines are genuine SBL machines in the State of Maine [and] selling counterfeit or 'knockoff' SBL machinery as genuine SBL machinery in the State of Maine."  (Id. at 17-18.)  I conclude that the summary judgment record cannot sustain this cause of action.  Most significantly, there is no evidence in the record of any ongoing deceptive trade practice.  To the contrary, J.S. McCarthy pointedly asserts that Brausse has ceased using the SBL prefix in the model number designation for the automatic foil stamping machines it currently sells.  (Additional Statement ¶¶ 46-47, 131.)  Without any evidence of an ongoing violation, an award of injunctive relief under the MDTPA is not called for and summary judgment should enter against count V.

**F.      Revocation of Acceptance**

The UCC allows a merchant to revoke its acceptance of a commercial good under specified circumstances:

> 1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it
>
>    a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
>
>    b) Without discovery of such nonconformity, if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
>  2) Revocation of acceptance must occur within a reasonable time after

16

> the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
>
> 3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

11 M.R.S.A. § 2-608; see also id. § 1-204(2) ("What is a reasonable time for taking any action [allowed under the Code] depends on the nature, purpose and circumstances of such action."). Brausse contends that revocation of acceptance is not allowed under the circumstances of this case because there is no evidence of a substantial impairment in value and because revocation was not timely. (Mot. Summ. J. at 26-28.) I agree with J.S. McCarthy that the summary judgment record generates a genuine issue of material fact as to the existence of a substantial impairment in value because a jury could find that the machine's unreliable performance undermined J.S. McCarthy's confidence in the reliability and integrity of the machine. See Inniss v. Methot Buick-Opel, Inc., 506 A.2d 212, 219 (Me. 1986) ("Any defect that shakes the buyer's faith or undermines his confidence in the reliability and integrity of the purchased item is deemed to work a substantial impairment of the item's value . . . .") (quoting McCullough v. Bill Swad Chrysler-Plymouth, Inc., 449 N.E. 2d 1289, 1294 (Ohio 1983)). It is a much closer question, however, whether the timing of J.S. McCarthy's rejection was reasonable under the circumstances. The record reflects that the machine was not rejected until after a period of 8 months had elapsed. Although a reasonableness standard generally presents a question of fact, Sherkate Sahami Khass Rapol v. Henry R. Jahn & Son, Inc., 701 F.2d 1049, 1051 (2d Cir. 1983) (applying New York's version of the UCC), a number of courts have treated the question of reasonableness as a question of law when the timing of the rejection notice is undisputed. See, e.g., Roger Edwards, LLC v. Fiddes & Son, Ltd., 245

17

F. Supp. 2d 251, 264-65 (D. Me. 2003) (finding a revocation that occurred more than a year after the discovery of a nonconformity ineffective as a matter of law and citing cases in which similar judgments were entered based merely on three-month delays). The passage of 8 months certainly raises a concern. However, based on the circumstances of this case, I do not think that a rejection of the machine in question after an 8-month period lies outside the bounds of reasonableness as a matter of law. Cf. Rankin v. Allstate Ins. Co., 336 F.3d 8, 15 & n.5 (1st Cir. 2003) ("Assuming the matter is fairly debatable, juries in federal court usually decide whether conduct was 'reasonable.'"); see also Inniss, 506 A.2d at 218-19 (affirming jury finding that automobile purchaser was entitled to revoke acceptance roughly nine months after acceptance and after driving automobile over 14,000 miles). The machine came with a one-year express warranty and the record reflects that J.S. McCarthy afforded Brausse several months time to work on the machine so that it might perform as promised. I am not inclined to think that the Law Court would necessarily hold that a buyer who forebears on revoking his acceptance of goods in order to give a seller a reasonable opportunity to make good on a warranty should be penalized for doing so. Based on my review of the record, I conclude that a reasonable jury might conclude: (1) that the gradual accretion of numerous problems and defects over the course of several months justifiably caused J.S. McCarthy to entirely lose faith and confidence in the machine and (2) that revocation of acceptance of the machine 8 months after its arrival was not unreasonable under those circumstances.

### G. Punitive Damages

Under Maine law, "[p]unitive damages are available if the plaintiff can establish by clear and convincing evidence that the defendant's conduct was motivated by actual ill

18

will or was so outrageous that malice is implied." Palleschi v. Palleschi, 1998 ME 3, ¶ 6, 704 A.2d 383, 385-86. Brausse argues that an award of punitive damages is out of the question in this case because there is no evidence capable of supporting the requisite finding. (Mot. Summ. J. at 28.) J.S. McCarthy's response is that Brausse's "willful actions . . . justify an award of punitive damages." (Opp'n Mem. at 26.) Of course, J.S. McCarthy's use of the term "willful" is utterly meaningless in this context. A tortfeasor may "willfully" engage in tortious behavior without necessarily having "actual ill will" or acting so outrageously that malice should be implied. See Tuttle v. Raymond, 494 A.2d 1353, 1361 (Me. 1985) (indicating that mere "recklessness" or "heedlessness" would "allow virtually limitless imposition of punitive damages" and concluding that punitive damages are available "only if the defendant acted with malice"). Indeed, even some fraudulent behavior may not be sufficiently outrageous to support an inference of malice. See Boivin v. Jones & Vining, Inc., 578 A.2d 187, 189 (Me. 1990); see also Drinkwater v. Patten Realty Corp., 563 A.2d 772, 776 (Me. 1989) ("No matter how egregious the breach, punitive damages are unavailable under Maine law for breach of contract."). Because there is no direct or circumstantial evidence of malice in this record, Brausse is entitled to summary judgment on J.S. McCarthy's "claim" for punitive damages (count VII).

## Conclusion

For the reasons set forth herein, I **RECOMMEND** that the court **GRANT**, **IN PART**, Brausse's motion for summary judgment (Docket No. 40) by entering judgment in favor of Brausse on counts III, IV, V and VII of the amended complaint (Docket No. 30) and **DENY, IN PART**, the motion with respect to counts I, II and VI of the amended

complaint and also with respect to Brausse's counterclaim for the balance of the contract price (Docket No. 31).

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated: April 22, 2005